## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

Richard Lee McCornell, Jr.,    )     C/A No.: 1:17-2761-SVH
                       )
        Plaintiff,      )
                       )
    vs.                )
                       )     ORDER
Nancy A. Berryhill, Acting    )
Commissioner of Social Security  )
Administration,          )
                       )
        Defendant.   )
                       )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated March 8, 2018, referring this matter for disposition. [ECF No. 21]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 19 and 20].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial

evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

## I.    Relevant Background

### A.    Procedural History

On April 11, 2013, Plaintiff protectively filed an application for DIB in which he alleged his disability began on July 1, 2012. Tr. at 146–47. His application was denied initially and upon reconsideration. Tr. at 90–94 and 96–98. On July 28, 2016, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Clarence Guthrie. Tr. at 37–62 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 20, 2016, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 21–36. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 2–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 12, 2017. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 34 years old at the time of the hearing. Tr. at 46. He completed high school. *Id.* His past relevant work ("PRW") was as a cashier, a

janitor, and a delivery driver. Tr. at 57. He alleges he has been unable to work since July 1, 2012. Tr. at 146.

2.    Medical History

A March 30, 2012 Cooperative Disability Investigations ("CDI") report indicates that the Social Security Administration ("SSA") had approved Plaintiff's disability claim in 2002 based on schizophrenia and that his benefits were subsequently suspended because of his work activity.[1] Tr at 217. Plaintiff applied for expedited reinstatement of his benefits and alleged that he had reduced his work to 22 to 25 hours per week. *Id.* The CDI unit initiated an investigation based on a referral from the state agency. *Id.* The investigator interviewed an assistant manager at Dollar General, who informed him that Plaintiff had worked for the store for at least five years[2]; had performed job duties that included opening and closing the store, making deposits, and interacting with customers; and was terminated for allegedly stealing items. Tr. at 218. The assistant manager indicated Plaintiff continued to shop in the store once a week, could carry on a conversation, and sometimes drove. *Id.* An assistant manager at Rite Aid informed the investigator that Plaintiff was employed as an assistant manager, had

[1] Plaintiff's certified earnings record reflects no income in 2002 or 2003, but income of $2,817.00 in 2004; $8,996.29 in 2005; $9,205.12 in 2006; $8,506.59 in 2007; $10,078.66 in 2008; $13,140.41 in 2009; $3,523.94 in 2010; $9,450.49 in 2011; $4,608.09 in 2012; $8,806.93 in 2013; and $12,458.07 in 2014.
[2] Plaintiff's detailed earnings query shows that he was employed at Dollar General from 2004 until 2010. Tr. at 157–58.

worked 30 to 40 hours per week, and had recently quit because he claimed he was not being scheduled for enough hours. Tr. at 219. He stated Plaintiff's job duties had included opening and closing the store, unloading trucks, stocking shelves, cleaning the building, assisting customers, operating a cash register and computer, supervising other employees, and making deposits. *Id.* He indicated Plaintiff had problems with attendance, was considered a poor manager, and performed poor quality work. *Id.* The investigator subsequently interviewed the Rite Aid store manager, who presented a slightly different account. *Id.* The store manager specified that Plaintiff was employed from May 16, 2011, to February 18, 2012, and worked 20 to 30 hours per week. *Id.* He stated Plaintiff got along well with staff and other supervisors. *Id.* He indicated Plaintiff did well if another manager was in the store, but not as well if no other manager was present. *Id.* He stated Plaintiff had indicated he wanted to work more hours, but failed to return calls and declined to work when he was called in at times that he was not scheduled to work. *Id.* The investigator parked in front of Plaintiff's house and observed him sitting on his porch. Tr. at 220. He noted that over the course of 13 minutes, Plaintiff spoke to a female, walked up and down the steps, placed items in a trash can, lifted objects, and talked and joked with a meter reader. *Id.*

Plaintiff presented to Trenten A. Prioleau, DPM ("Dr. Prioleau"), for a three-month history of left heel pain on May 17, 2012. Tr. at 225. Dr.

Prioleau noted tenderness to palpation of Plaintiff's left heel. *Id.* He assessed

plantar fasciitis and instructed Plaintiff to engage in stretching exercises and

to use ice massage. Tr. at 226. On May 31, 2012, Plaintiff reported that he

was not in pain, had been walking more, and had lost 15 pounds. Tr. at 227.

Dr. Prioleau encouraged Plaintiff to continue to use stretching and icing. Tr.

at 228.

Plaintiff reported that he was doing well on June 27, 2012. Tr. at 243.

He indicated his mood and affect were euthymic and denied psychotic

symptoms and side effects from medications. *Id.* Edward M. Kendall, M.D.

("Dr. Kendall"), noted no abnormalities on mental status examination. *Id.* He

assessed paranoid schizophrenia and a global assessment of functioning

("GAF")[3] score of 60.[4] Tr. at 243–44.

On September 21, 2012, Ada Stewart, M.D. ("Dr. Stewart"), indicated

Plaintiff had a history of diabetes, obesity, and schizophrenia. Tr. at 223. She

noted that Plaintiff had decreased his weight from 328 to 282 pounds and

---

[3] The GAF scale is used to track clinical progress of individuals with respect
to psychological, social, and occupational functioning. American Psychiatric
Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth
Edition, Text Revision. Washington, DC, American Psychiatric Association,
2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment
based on symptom severity and level of functioning. *Id.* If an individual's
symptom severity and level of functioning are discordant, the GAF score
reflects the worse of the two. *Id.*

[4] *A GAF score of 51–60* indicates "moderate symptoms (e.g., circumstantial
speech and occasional panic attacks) OR moderate difficulty in social or
occupational functioning (e.g., few friends, conflicts with peers or co-
workers)." *DSM-IV-TR.*

should continue with diet and exercise. Tr. at 224. She stated Plaintiff's diabetes was well-controlled and recommended that he continue his current treatment. *Id.* She added a prescription for Lisinopril for hypertension. *Id.*

On October 17, 2012, Plaintiff reported that he had lost over 60 pounds and indicated that Dr. Stewart would consider taking him off Metformin if he lost an additional 60 pounds. Tr. at 247. He indicated he had experienced no paranoia during the prior month and was doing well overall. *Id.*

On January 29, 2013, Plaintiff reported that when did not take his medication he got angry, wanted to fight, had outbursts with family members, heard voices, had difficulty sleeping, and was unable to shut off his thoughts. Tr. at 249. He stated that when he took his medication, he felt calm, heard no voices, and did well. *Id.* He stated he continued to feel somewhat irritable, easily provoked, moody, and socially withdrawn at times while taking medication. *Id.* He indicated he could likely work part-time, but would be unable to work on some days on an unpredictable basis. *Id.* Dr. Kendall indicated Plaintiff's mental status was normal, aside from fair judgment and insight, occasional irritability, and occasional auditory hallucinations. Tr. at 249–50. He assessed paranoid schizophrenia and a GAF score of 55. Tr. at 250. He continued Plaintiff on six milligrams of Risperdal per day. *Id.*

On April 23, 2013, Plaintiff indicated that frequent worry was preventing him from sleeping well. Tr. at 254. He denied auditory and visual hallucinations. *Id.* He informed Linda Smith, R.N. ("Ms. Smith"), that he had worked full-time for a while without realizing that it would affect his disability, but had decompensated and had lost both his job and his disability benefits. *Id.* Aziz Mohiuddin, M.D. ("Dr. Mohiuddin"), refilled Plaintiff's prescription for Risperdal. Tr. at 256.

On July 11, 2013, Plaintiff complained of intermittent depression, poor energy, low motivation, and social withdrawal. Tr. at 238. He reported that he had attempted suicide through strangulation a few months prior, but had aborted the attempt. *Id.* He denied current suicidal ideation. *Id.* He stated his grandmother had recently passed away and that he was having difficulty processing his grief. *Id.* Dr. Kendall noted that Plaintiff was "clearly bereaved" and "near tears." *Id.* He described Plaintiff as having poor judgment and insight, labile and bereaved mood, and a full range of emotion. Tr. at 239. He also noted that Plaintiff demonstrated cooperative behavior, no psychomotor abnormalities, intact cognition, normal speech, no hallucinations, no delusions, no suicidal or homicidal ideation, and a logical and goal-directed thought process. *Id.* He assessed paranoid schizophrenia

and bereavement and a GAF score of 50.[5] *Id.* He noted that no changes in Plaintiff's medication were needed. *Id.* He stated he believed that Plaintiff was disabled and would support his claim for disability benefits. *Id.*

Plaintiff presented to Thomas J. Motycka, M.D. ("Dr. Motycka"), for a consultative examination on August 28, 2013. Tr. at 257. He reported that he had been diagnosed with paranoid schizophrenia that caused him to hallucinate, experience rage, and become violent. *Id.* Dr. Motycka stated Plaintiff did "not appear to have paranoid schizophrenia, or depression." *Id.* He noted that Plaintiff put forth "a poor effort" and was "very, very unconvincing." *Id.* Plaintiff claimed to have neuropathy, but Dr. Motycka noted that his records showed only plantar faciitis and diabetes that was treated with Metformin. *Id.* Dr. Motycka observed Plaintiff to walk with a normal gait and to demonstrate "feeble efforts" on range of motion ("ROM") testing. *Id.* Plaintiff held his right hand in a claw-like manner and claimed that his wrist was injured, but Dr. Motycka found his claim to be "incredible" and "unbelievable." *Id.* Dr. Motycka indicated Plaintiff's blood pressure was 129/83 mm/Hg. Tr. at 259. He noted Plaintiff was 5'8" tall and weighed 321 pounds with a body mass index ("BMI") of 48. *Id.* He stated Plaintiff's poor effort was obvious and his presentation was "rife with concerns about his

---

[5] *A GAF score of 41–50* indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

credibility." *Id.* He observed Plaintiff to have no clubbing, cyanosis, or edema; to demonstrate normal dorsalis pedis and posterior tibial pulses; to have no crepitus, effusions, redness, warmth, instability, McMurray clicks, or Baker's cyst in the knees; to have normal radial pulses in his hands; to show no swelling or crepitus and normal ROM of his wrists; and to demonstrate normal and non-tender hips and acromioclavicular joints. Tr. at 260. Dr. Motycka stated the orthopedic examination was entirely normal. *Id.* He assessed features of borderline and antisocial personality disorders. *Id.* He indicated that Plaintiff's weight was "a big problem" and that Plaintiff needed to lose weight. Tr. at 261. He indicated it seemed as if Plaintiff was engaging in "a rehearsed effort for secondary gain" and opined that he was "able to do any type of work he has done in the past." *Id.*

On October 2, 2013, state agency psychological consultant Samuel Goots, Ph.D. ("Dr. Goots"), reviewed the evidence and completed a psychiatric review technique ("PRT"). Tr. at 68–69. He considered Listing 12.03 for schizophrenic, paranoid, and other psychotic disorders and assessed no repeated episodes of decompensation, mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* He found that Plaintiff had moderate limitations in his mental residual functional capacity ("RFC") with respect to abilities to understand and

remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruption from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 69–71. He found Plaintiff to have "partially credible symptoms" that were consistent with schizophrenia. Tr. at 68. However, he noted that Plaintiff's "reasonable adaptive functioning," "good work history," the CDI report, and Dr. Motycka's report suggested malingering and did not indicate severe limitations as a result of a mental condition. *Id.* He stated the totality of the evidence indicated Plaintiff was "capable of simple work in a setting with limited contact with the general public." *Id.* He indicated Plaintiff could understand, retain, and follow simple instructions; could concentrate well enough to complete simple tasks with ordinary supervision; would have moderate difficulty with more detailed instructions and complex tasks; could complete a normal workweek with an

occasional interruption due to his mental condition; would function best in a work setting with limited contact with the general public and minimal interaction with coworkers and supervisors; and could avoid common work-related dangers. Tr. at 71.

On January 31, 2014, a second state agency psychological consultant, Leslie Burke, Ph.D. ("Dr. Burke"), completed a PRT and assessed the same degree of limitation and the same mental RFC as Dr. Goots. *Compare* Tr. at 81–82 and Tr. at 83–85, *with* Tr. at 68–69 and Tr. 69–71.

Plaintiff presented to Columbia Area Mental Health Center ("CAMHC") for an initial psychiatric assessment on September 11, 2015. Tr. at 329. He reported anger and thoughts of harming others. *Id.* He endorsed paranoid thoughts and indicated he was only sleeping for an hour or two at night. *Id.* Kathy M. Lundvall, M.D. ("Dr. Lundvall"), noted that Plaintiff's weight had decreased to 220 pounds. Tr. at 330. She observed him to demonstrate mild hand tremors. *Id.* She indicated the following abnormalities on mental status examination: hyperactive behavior; poor, anxious, restless, and avoidant eye contact; circumstantial thought process; perseveration; persecutory delusions; paranoid thoughts; homicidal ideation without plan; auditory hallucinations; anxious, angry, and irritable mood; inappropriate, anxious, irritable, and restless affect; and fair insight and judgment. Tr. at 330. She assessed paranoid schizophrenia, bereavement,

and a GAF score of 50. *Id.* She prescribed three milligrams of Risperdal twice a day and provided samples to Plaintiff. *Id.*

Plaintiff presented to CAMHC for a clinical reassessment on September 24, 2015. Tr. at 287. He reported that he was hearing voices "all the time" and experiencing "deep depression." *Id.* He stated he felt like being alone, had no motivation, and had lost everything. *Id.* He denied suicide attempts, but endorsed suicidal thoughts. *Id.* Loyda C. Stevens, M. Ed., R.N. ("Ms. Stevens"), described Plaintiff as appearing neat and clean; showing appropriate motor activity; having a cooperative attitude; demonstrating an appropriate affect; having a happy mood; speaking at a normal rate and tone; demonstrating a normal thought process; endorsing paranoid thought content, auditory hallucinations, and persecutory delusions; being oriented to person, place, time, and situation; showing poor decision making and judgment; having poor remote memory; being easily distracted; and demonstrating an average fund of knowledge. Tr. at 289–90. She indicated Plaintiff's weight to be 215 pounds. Tr. at 290. Plaintiff reported adequate sleep, appetite, energy level, and libido. *Id.* Ms. Stevens noted that Plaintiff presented as "very happy, friendly and appropriately engaging." *Id.* She indicated Plaintiff did not talk of "wanting to hurt people." *Id.* She noted that Plaintiff had resumed use of Risperdal following his appointment with Dr. Lundvall and considered the medication to be helping with his mood and

thoughts. *Id.* Plaintiff reported that he had lost his job as a janitor because he was experiencing paranoia, but he indicated he was not taking his medication at the time and acknowledged that he "fe[lt] better and [did] not get angry easily" when taking his medication. Tr. at 291. Ms. Stevens provided more samples of Risperdal and referred Plaintiff to a case manager. *Id.*

On September 30, 2015, Plaintiff endorsed depression and anxiety and reported he was doing "fair" and taking his medication daily. Tr. at 326–27. He was proud of his weight loss and indicated he was taking daily walks for exercise. Tr. at 327. He stated he became violent and experienced "terrible" auditory hallucinations when he was not taking his medication. *Id.* He denied suicidal and homicidal ideation. *Id.* Elizabeth S. Nixon, R.N. ("Ms. Nixon"), observed Plaintiff to be dressed nicely and on time for his appointment. *Id.*

Plaintiff presented to Laurinda Saxon, M.H.P., L.P.C. ("Ms. Saxon"), on the same day for individual therapy. Tr. at 343. Ms. Saxon described Plaintiff as pleasant, cooperative, and appropriately dressed and groomed. *Id.* She noted Plaintiff had a bright affect, maintained good and direct eye contact, and was able to articulate his feelings and thoughts and process information without difficulty. *Id.* Plaintiff indicated he had difficulty maintaining employment because of his symptoms. *Id.* He stated he spent a lot of time alone or with family and did not have an active social life. *Id.* He indicated his sleep, diet, depression, and auditory hallucinations had improved since he

restarted his medications. *Id.* He reported his mood was "good" and expressed a desire to comply with medication and treatment. *Id.*

On October 29, 2015, Plaintiff reported that he was "doing a little bit better." Tr. at 323. He indicated he was living with his father, but tended to self-isolate and felt like he did not fit in. *Id.* He complained of hearing voices "from time to time," but indicated he heard them less frequently while taking the medication. *Id.* He denied visual hallucinations. *Id.* Dr. Mohiuddin indicated that Plaintiff was experiencing persecutory delusions and auditory hallucinations and had fair judgment and insight, but otherwise noted normal findings on mental status examination. *Id.* He continued Plaintiff on three milligrams of Risperdal twice a day. *Id.*

On the same day, Plaintiff presented to Ms. Saxon for individual therapy. Tr. at 342. He reported that his medication helped him to better control his anger. *Id.* He continued to endorse occasional paranoia and auditory hallucinations. *Id.* He indicated he did not have a lot of friends, but talked with some friends on the phone. *Id.* Ms. Saxon noted that Plaintiff had limited insight into his illness. *Id.*

On November 18, 2015, Plaintiff reported that he was compliant with his medications, but did not feel like he needed them. Tr. at 340. He admitted that he had difficulty controlling his impulses when he was off his

medication. *Id.* Ms. Saxon described Plaintiff as appropriately dressed and groomed. *Id.* She encouraged him to develop a daily routine. *Id.*

On January 20, 2016, Plaintiff presented to Lan Bonno-Lebozec, Ed.S., M.H.P. ("Ms. Bonno-Lebozec"), for individual therapy. Tr. at 338. He indicated his life was "very stable" and "good" and expressed a desire to return to work and reengage in the community. *Id.*

Plaintiff reported that he was doing well and taking his medication daily on February 23, 2016. Tr. at 303. He indicated he was living with his father and had a girlfriend. *Id.* He endorsed some irritability and paranoid thinking. *Id.* Ms. Nixon observed Plaintiff to be well-dressed. *Id.*

Plaintiff reported that he was "doing better" on March 17, 2016. Tr. at 300. He indicated he self-isolated and sometimes felt angry, but used meditation to get over his anger. *Id.* He denied auditory hallucinations, delusional thinking, and suicidal and homicidal ideation. *Id.* Dr. Mohiuddin observed Plaintiff to have a stable mood and to smile a lot. *Id.* He assessed mild impairment to Plaintiff's concentration and fair insight and judgment, but indicated otherwise normal findings on mental status examination. *Id.* He continued Plaintiff on three milligrams of Risperdal twice a day. *Id.*

Plaintiff reported to Ms. Bonno-Lebozec the same day for individual therapy. Tr. at 336. He reported being happy and having little stress, but

indicated he felt bored and desired to participate in an employment workshop. *Id.* He denied delusions and auditory hallucinations. *Id.*

On April 12, 2016, Plaintiff reported "feeling okay," but being "up and down" on some days. Tr. at 299. He complained of occasional depression and indicated he felt increasingly anxious and irritated when he was around other people. *Id.* He denied suicidal and homicidal ideation. *Id.* Ms. Nixon observed Plaintiff to be dressed nicely and on time for his appointment. *Id.*

On April 14, 2016, Ms. Bonno-Lebozec indicated Plaintiff had been stabilized with medications and exhibited appropriate behavior. Tr. at 335. Plaintiff expressed a desire to work part-time through South Carolina Vocational Rehabilitation ("SCVR"). *Id.*

On April 28, 2016, Ms. Bonno-Lebozec encouraged Plaintiff to start a workshop through SCVR. Tr. at 334. She indicated Plaintiff was "very clever," well-read, and well-oriented. *Id.*

On May 19, 2016, Plaintiff reported that he was doing well, aside from dry mouth and constipation. Tr. at 296. He stated his sleep and appetite were okay and that his paranoia had decreased. *Id.* He denied auditory hallucinations and suicidal and homicidal ideation. *Id.* Dr. Mohiuddin observed Plaintiff to be dressed neatly. *Id.* He indicated Plaintiff's judgment and insight were fair and that all other findings on mental status examination were normal. *Id.*

On July 14, 2016, Plaintiff reported that he was taking his medication and doing well. Tr. at 295. He indicated he was living with his father and working out on a daily basis. *Id.* He denied suicidal and homicidal ideation. *Id.* Ms. Nixon observed Plaintiff to be well-dressed, "making jokes," and "laughing a lot." *Id.*

On August 3, 2016, Plaintiff reported that he had been living with his father for two years, but had recently moved out because he had thoughts of "hurting [his father] with a knife" during an argument. Tr. at 292. He indicated he was homeless and "living under a bridge." *Id.* He endorsed increased anxiety, interrupted sleep, self-isolation, and auditory hallucinations. *Id.* He denied visual hallucinations, delusions, and suicidal and homicidal ideation and stated his appetite was good. *Id.* Queen J. Flowers, APRN-BC ("Ms. Flowers"), observed Plaintiff to have depressed mood, flat affect, and fair insight and judgment. *Id.* She indicated Plaintiff was oriented to time, place, person, and circumstance; demonstrated normal appearance, eye contact, and speech; had intact associations, attention, memory, and concentration; displayed a cooperative attitude and calm behavior; and showed a logical/goal-directed thought process. *Id.*

Plaintiff met with Ms. Bonno-Lebozec for individual therapy on August 3, 2016. Tr. at 332. Ms. Bonno-Lebozec encouraged Plaintiff to "start moving in the direction of working and reengaging himself with the community." *Id.*

However, she also stated that Plaintiff needed "to reapply for disability as he has very limited insight and understanding of his world." *Id.* She referred Plaintiff to several providers for assistance with housing and benefits. *Id.*

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing on July 28, 2016, Plaintiff, appearing pro se, testified that he was homeless. Tr. at 45. He indicated he had been living with someone, but had to leave because of his rage. Tr. at 51. He denied having a driver's license. Tr. at 47. He indicated he had most recently worked for three months as a school custodian, for six months a mattress delivery driver, and for the holiday season as a bell ringer for the Salvation Army. Tr. at 48. He stated he had stopped working two years prior. Tr. at 49.

Plaintiff testified that he applied for disability because he had difficulty maintaining a job. Tr. at 50. He stated his employers would tell him that he was "crazy" and that he did not "fit in on their jobs." *Id.* He confirmed that he had been diagnosed with paranoid schizophrenia. *Id.* He indicated he did not work well with others because he always felt as if someone was messing with him. *Id.* He stated he was very temperamental. *Id.* He testified that he spoke to and heard a voice that encouraged him to harm himself and others. Tr. at

54–55. He indicated he felt angry and feared that others were trying to harm him. Tr. at 54. He stated he had once attempted suicide. Tr. at 55.

Plaintiff testified that he had been diagnosed with diabetes in 2012 or 2013. Tr. at 51. He indicated that neuropathy in his feet caused difficulty in getting around. Tr. at 50. He endorsed an undiagnosed wrist problem that caused clicking and severe pain. *Id.* He stated he was prescribed Metformin for diabetes, Risperdal for schizophrenia, and Lisinopril for hypertension. Tr. at 51.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Debbie Dean reviewed the record and testified at the hearing. Tr. at 56–59. The VE categorized Plaintiff's PRW as a cashier, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-014, as light with a specific vocational preparation ("SVP") of three; a janitor, *DOT* number 381.687-018, as medium with an SVP of two; and a delivery driver, *DOT* number 292.353-010, as medium with an SVP of three. Tr. at 57. The ALJ described a hypothetical individual of Plaintiff's vocational profile who would have no exertional limitations, but would be limited to simple, routine, repetitive tasks; would be able to make simple work-related decisions; could tolerate occasional changes in the work setting; could tolerate occasional interaction with the public and coworkers; and could accept instructions and respond appropriately to supervisors where the interaction occurred

occasionally throughout the workday. Tr. at 57–58. The VE testified that the hypothetical individual would unable to perform Plaintiff's PRW. Tr. at 58 The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified medium jobs with an SVP of two as a dishwasher, *DOT* number 318.687-010, with 277,000 positions in the national economy; a linen room stocker, *DOT* number 222.684-010, with 85,000 positions in the national economy; and a hand packer, *DOT* number 920.587-018, with 162,000 positions in the national economy. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who would miss four days of work per month. Tr. at 59. He asked if the limitation would eliminate competitive employment. *Id.* The VE confirmed that it would. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider that the individual would be off task for 20 percent of the workday, in addition to regular breaks. *Id.* He asked if the limitation would eliminate competitive employment. *Id.* The VE confirmed that it would. *Id.*

### 2. The ALJ's Findings

In his decision dated September 20, 2016, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

20

2. The claimant engaged in substantial gainful activity during the following periods: October 2013 through June 2014 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairment: schizophrenia (20 CFR 404.1520(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine and repetitive tasks. He has the ability to make simple work-related decisions, and can tolerate occasional changes in the work setting. He can tolerate occasional interaction with the public, and occasional interaction with coworkers. He can accept instructions and respond appropriately to supervisors, where this interaction occurs occasionally throughout the workday.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on January 7, 1982 and was 30 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferabilty of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2012, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 26–33.

II.    Discussion

Plaintiff alleges the ALJ failed to account for his moderate difficulties in maintaining concentration, persistence, or pace in limiting him to simple, routine, repetitive tasks. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting

"need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

Plaintiff argues the ALJ did not sufficiently account for his moderate difficulties in maintaining concentration, persistence, or pace in limiting him to simple, routine, repetitive tasks. [ECF No. 18 at 7]. He maintains the ALJ's error is comparable to the error recognized by the Fourth Circuit in *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), and that the ALJ did not account for his ability to stay on task throughout the workday. *Id.* at 7–8.

The Commissioner argues the instant case differs from *Mascio* in that the ALJ accounted for Plaintiff's mental limitations in his hypothetical question to the VE. [ECF No. 22 at 5]. She further maintains the ALJ included more significant restrictions in that he limited Plaintiff to simple work-related decisions, occasional changes in the work setting, occasional interaction with the public, occasional interaction with coworkers, and specified that he could accept instructions and respond appropriately to supervisors occasionally throughout the workday. *Id.* She contends the additional restrictions address any limitation in Plaintiff's ability to maintain pace and stay on task. *Id.* She claims the ALJ cited sufficient evidence to support his conclusion that Plaintiff had no greater restrictions than those included in the RFC assessment. *Id.* at 5–7.

A claimant's RFC represents the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.* The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and continuing basis. *Id.* at *2. He must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Pursuant to Listing 12.00(E)(3), evaluation of a claimant's ability to maintain concentration, persistence, or pace requires examination of his "abilities to focus attention on work activities and stay on task at a sustained rate." "[T]he nature of this area of mental functioning" includes: "initiating and performing a task that you understand and know how to do; working at

an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).

In *Mascio*, 780 F.3d at 638, the court found that the ALJ erred in assessing the plaintiff's RFC. *Id.* It stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* The court explained that it was possible for the ALJ to find that the moderate concentration, persistence, or pace limitation did not affect the plaintiff's ability to work, but that remand was required "because the ALJ here gave no explanation." *Id.* This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how he considered the claimant's limitation in concentration, persistence, or pace in assessing his RFC. *See Sipple v. Colvin*, No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate

limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

As an initial matter, the court notes that unlike the ALJ in *Mascio*, who included no mental restrictions in the hypothetical question he presented to the VE, the ALJ in the instant case questioned the VE about the same mental limitations he adopted as the RFC assessment. *Compare* Tr. at 29, *with* Tr. at 57–58. Contrary to Plaintiff's argument, the ALJ did not simply limit him to simple, routine, repetitive tasks, but also included limitations for making simple work-related decisions, tolerating occasional changes in the work setting, tolerating occasional interaction with the public and coworkers, and accepting instructions and responding appropriately to supervisors occasionally throughout the workday. Tr. at 29. The additional restrictions pertained directly to several components of Plaintiff's ability to maintain concentration, persistence, or pace, including his abilities to initiate and perform tasks he understood and knew how to do, ignore or avoid distractions from others while working, change activities or work setting, and work close to or with others without distracting them. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).

Although the ALJ did not explicitly state that Plaintiff had no difficulty staying on task, he cited evidence that supported such a conclusion. He specified that "[t]reatment records reflect[ed] that the claimant ha[d]

displayed alert and oriented presentation, intact attention, fair judgment and insight, logical and goal-directed thought processes, normal thought content, intact concentration, intact memory, and intact associations (Exhibits 4F and 7F)." Tr. at 28. He pointed out that only one treatment note had shown "circumstantial thought process, poor judgment, poor remote memory, easily distracted, and mildly impaired concentration (Exhibit 7F)." *Id.* He concluded that "most of the clinical findings ha[d] been normal and that most of Plaintiff's statements suggested he was doing well on medication. *Id.*

The Fourth Circuit has held that an ALJ adequately accommodates a claimant's moderate difficulties in concentration, persistence, or pace by crediting medical opinions of record and considering the limitations the medical providers indicated as part of the RFC assessment. *Sizemore v. Berryhill*, 878 F.3d 72, 81 (4th Cir. 2017). The ALJ gave great weight to opinions from Drs. Goots and Burke, who opined that Plaintiff could complete a normal workweek with only an occasional interruption (Tr. at 69 and 71). *See* Tr. at 31. He found their opinions to be consistent with Plaintiff's reports to his medical providers and his medical providers' findings and treatment records. *Id.* By crediting opinions from Drs. Goots and Burke, the ALJ found that Plaintiff generally retained the ability to stay on task to complete a normal workweek.

Although Plaintiff correctly asserts that Drs. Goots and Burke rendered their opinions prior to his presentation to CAMHC in September 2015 with more severe symptoms (ECF Nos. 18 at 9 and 23 at 2), the ALJ's reliance on their opinions is not undermined by the subsequent evidence. The ALJ acknowledged that Plaintiff had presented to Dr. Lundvall with hyperactive behavior, anxious affect, circumstantial thought processes, and reports of paranoid thoughts and auditory hallucinations in September 2015, but explained that his presentation quickly improved after he resumed treatment and medications. Tr. at 30. He noted that Dr. Lundvall had restarted Plaintiff on Risperdal and that his mood, behavior, affect, and thought content and process were significantly improved at a two-week follow up visit. *Id.* He pointed out that Plaintiff reported doing well and that his providers indicated generally normal mental status examination findings during subsequent visits in 2015 and 2016. *Id.*

The ALJ provided a thorough discussion to support his conclusion that Plaintiff's moderate limitation in concentration, persistence, or pace did not further limit his RFC. He noted that Plaintiff had "intermittently complained of auditory hallucinations" and paranoia, but found that the record did "not indicate significant problems, as he has never required psychiatric hospitalization or indicated significant psychotic signs during examinations" and was "able to consistently work from 2012 through the third quarter of

2015 (Exhibits 2D, 4D, 5D, and 6D)." Tr. at 28 and 30. He stated the medical evidence showed "mostly normal objective clinical findings without any psychiatric hospitalization or emergency room visit for any mental symptoms." Tr. at 30. He indicated Dr. Kendall's records reflected that Risperdal was effective in calming Plaintiff's mood without adjustments in dosage; that Plaintiff reported "doing well"; and that Plaintiff had a euthymic mood and affect, cooperative behavior, intact attention, fair judgment and insight, logical and goal-directed thought processes, and no hallucinations or delusions. *Id.* He pointed out that Plaintiff had not received mental health treatment from July 2013 through September 2015, but that his symptoms quickly improved after treatment and medication were restarted. *Id.*

In light of the foregoing, the court finds the ALJ adequately evaluated Plaintiff's moderate difficulties in concentration, persistence, or pace and that substantial evidence supports the RFC assessment.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

May 16, 2018                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge